**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA MARIE CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2: 10-cv-00378 |
| | ) | |
| PNC FINANCIAL SERVICES GROUP, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Presently pending before the Court is DEFENDANT'S MOTION FOR SUMMARY

JUDGMENT, with memorandum of law in support, filed by Defendant PNC Financial Services

Group. Doc. Nos. 26 and 27. Defendant has also filed an appendix and a separate statement of

undisputed material facts in support of its motion for summary judgment (Doc. Nos. 28 and 29)

pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1. Plaintiff, proceeding *pro se*, filed a response in

opposition to Defendant's motion for summary judgment. Doc. No. 31. The motion is ripe for

disposition. For the following reasons, Defendant's motion for summary judgment will be

granted.

**Statement of the Case**

**A.      Procedural History**

On March 22, 2010, Plaintiff, Lisa Marie Clark, initiated this case with the filing of her

motion to proceed *in forma pauperis* with a copy of her complaint on March 22, 2010, against

Defendant, PNC Financial Services Group, Inc. ("PNC").[1]  Doc. No. 1.  Plaintiff's motion was

---

[1]      The Court notes that the Complaint identifies Defendant as "PNC Financial Services
Group."  According to Defendant, its correct name is "The PNC Financial Services Group, Inc."
*See* Doc. No. 14, Answer to Plaintiff's Amended Complaint.  For the purpose of this Opinion

granted, and her complaint was deemed filed on March 23, 2010. Doc. No. 2. On October 13, 2010, this Court's Memorandum Opinion and Order granted in part and denied in part Defendant's motion to dismiss Plaintiff's complaint. Doc. No. 12. In response, Plaintiff amended her complaint on October 22, 2010, alleging a claim of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.* based upon her race (African-American). Doc. No. 13, Amended Complaint. Generally speaking, on June 29, 2009, Plaintiff, who was in the employ of the Defendant at the time, was placed on administrative leave with pay pending the results of an investigation into whether she violated Defendant's Code of Ethics. Am. Compl. at ¶ 5. Her employment was subsequently terminated by Defendant on July 15, 2009. Am. Compl.at ¶ 7. Plaintiff alleges that her "suspension and termination" were racially motivated, and, as such, violated Title VII. Am. Compl. at ¶ 8. Defendant answered the amended complaint (Doc. No. 14) with a denial of any discrimination, and a period of discovery followed. Upon completion of the period of discovery, Defendant filed its motion for summary judgment.

**B.     Factual Background**

The facts as recounted here are taken from Plaintiff's amended complaint (Doc. No. 13), Defendant's statement of material facts (Doc. No. 29), the appendix to Defendant's motion for summary judgment (Doc. No. 28), and Plaintiff's response thereto (Doc. No. 31). The facts and all reasonable inferences are viewed in a light most favorable to Plaintiff, the non-moving party.

**1.     Plaintiff's employment background with Defendant**

Plaintiff began her employment with Defendant on June 24, 2001 as a Financial Services Consultant. In 2003, Plaintiff was transferred to the Channel Services Department of the

---

and Order, the Court will utilize the references of either "Defendant" or "PNC" to refer to The PNC Financial Services Group, Inc.

National Financial Services Center, which was located in the USX Tower at 600 Grant Street in downtown Pittsburgh. Doc. No. 28-1, Deposition transcript of Plaintiff at transcript page 16. Plaintiff's primary duties in the Channel Services Department included completing customer account maintenance requests, handling loose mail, and opening and closing accounts. Doc. No. 28-1, Dep. Tr. of Plaintiff at Tr. p. 19. Beginning in 2008, Lead Financial Services Consultant Mark Ray became Plaintiff's direct supervisor. Doc. No. 28-1, Dep. Tr. of Plaintiff at Tr. p. 19.

At times, Plaintiff's duties required her to work in the Channel Services Department's mailroom. Doc. No. 28-1, Dep. Tr. of Plaintiff at Tr. p. 20. Within the mailroom was a United Parcel Service ("UPS") postage machine that PNC employees utilized to prepare packages for shipping items related to Defendant's business activities, and to bill for the expense of the shipping. Doc. No. 28-1, Depo. Tr. of Plaintiff at Tr. pp. 20 – 21. While working in the Channel Services Department, Plaintiff used the UPS machine to send packages to customers on behalf of PNC for bank business. Doc. No. 28-1, Depo. Tr. of Plaintiff at Tr. p. 21.

### 2. PNC's Code of Ethics

Employees of Defendant are expected to follow and comply with PNC's Code of Business Conduct and Ethics and Employee Conduct Policies ("Code of Ethics"). *Inter alia*, the Code of Ethics sets standards for ethical conduct for all employees. A recurring theme within this Code is that employees should "protect PNC's property, and use it for legitimate business purposes, but not for improper personal gain or benefit." Doc. No. 28-1, Dep. Exs. 14 and 15; *see also*, Depo. Tr. of Plaintiff, Tr. p. 59 - 60. In terms of the standards involving the handling of corporate assets, the Code of Ethics covered two broad categories: 1) corporate property and inventions, and 2) electronic media. Doc. No. 28-1, Dep. Ex. 17, at "Use of PNC Assets". Corporate property and assets is defined as "PNC's physical facilities, office supplies,

furnishings, automobiles and aircraft, products, services, technologies, processes, files, documents, U.S. mail delivered to a PNC address, inventions by PNC employees, etc." *Id.* Electronic media is defined as "telephones, e-mails, fax machines, personal computers, cell phones, voice mail and pagers, instant messaging, text messaging, etc." *Id.* Furthermore, the policy with respect to the use of electronic media is as follows:

> The Electronic Media Policy applies to the use of all Electronic Media when:
>
> - Accessing on or from PNC premises;
>
> - Using PNC's leased or purchased services (e.g., PNC's corporate network or Internet/Intranet connection);
>
> - Using PNC's leased or owned equipment (e.g., laptops, hand-held devices, or cell phones); or
>
> - Using your own or a third party's Electronic Media to conduct PNC-related business or in a manner that identifies PNC,
>
> <u>General Rules for Appropriate Use of Electronic Media</u>
>
> The company provides Electronic Media resources to facilitate company-related business. Unless otherwise restricted, occasional personal use of these resources is permitted. However, non-business use must be kept to a minimum, must be governed by good judgment and may not disrupt business operations or interfere with the performance or your job responsibilities. Your business unit may have additional procedures limiting the use of Electronic Media.

Doc. No. 28-1, Depo. Ex. 14 at § 3.04.

When she was hired, Plaintiff acknowledged in writing that she had received and read the Code of Ethics, and that she would comply with the standards. Doc. No. 28-1 at Dep. Ex. 5. Furthermore, on at least three occasions during her employment with Defendant, Plaintiff participated in online refresher training regarding the PNC Code of Ethics. Doc. No. 28-1, Depo. Tr. of Plaintiff at Tr. p. 16. Plaintiff was aware during her employment that a failure to abide by PNC's Code of Ethics could lead to her discharge. Doc. No. 28-1; Depo. Tr. of Plaintiff at Tr. p. 60.

### 3. Investigation into unauthorized use of UPS postage machine

In June 2009, a package that had been sent through the Channel Service's UPS machine was returned as undeliverable. Doc. No. 28-1, Decl. of Mark Ray at ¶1. The package was originally sent by Financial Services Consultant Lynn Coppola, and was a personal package unrelated to official PNC business. *Id*. at ¶ 2. Coppola was questioned about the package by Lead Financial Services Consultant Mark Ray, who was concerned that the UPS machine had been misused to send a personal package. *Id*. at ¶ 3. In the course of that discussion, Coppola informed Ray that Plaintiff had also used the PNC Channel Service's UPS machine to send a personal package, and further that Plaintiff had informed her that such use was permissible. *Id*. On June 26, 2009, Ray reported the incident to the Employee Information Resources Center ("ERIC") that Coppola had committed potential policy violations, specifically misusing PNC property. *Id*.

Janice Law is employed by Defendant as a Senior Employee Relations Investigator, and investigated the possible misuse of the UPS machine that was reported by Ray. Doc. No. 28-1, Decl. of Janice Law at ¶ 5. As part of her investigation, Law interviewed Ray, Lynn Coppola, Plaintiff and other employees in Defendant's National Finance Service Center's Channel Services Department. *Id*. On June 29, 2009, during her interview with Jan Law, Coppola admitted that she sent a package through the department's UPS machine, but expressed her intention that she was planning to reimburse PNC for the cost of the shipping. *Id*. at ¶ 6. At the conclusion of the interview, Coppola returned to her regular work station. *Id*. at ¶ 10. By July 9, 2009, Law had concluded that Coppola never intended to reimburse PNC for the cost of sending her personal package, and she placed Coppola on administrative leave with pay pending the outcome of the investigation. Doc. No. 28-1, Decl. of Law at ¶ 10.

Law interviewed Plaintiff on two occasions, once on June 29, 2009 (the same day she interviewed Coppola), and again on July 3, 2009. Plaintiff admitted to Law that in October 2008, she sent a personal package to her brother, who was living in Houston, TX, using the UPS machine, and that she billed her Department's cost center for the expense. *Id*. at ¶ 7; *see also* Doc. No. 13, Amended Complaint at ¶ 1; Doc. No 28-1, Depo. Tr. of Plaintiff at Tr. p. 23. Plaintiff explained at the time that she did not have to reimburse PNC for the cost of sending the package based on her belief that during the ethics refresher training, employees were advised that they were not required to pay for personal use of the company's fax machine, printer or copier, as long as there was no conflict of interest. Doc. No. 28-1, Depo. Tr. of Plaintiff at Tr. pp. 24 – 25. At the end of the interview on June 29, 2009, Law placed Plaintiff on administrative leave based upon Plaintiff's "complete misunderstanding" of PNC's policies, including her failure to recognize the clear distinction between acceptable limited, personal use of PNC equipment and electronic media, and knowingly charging a personal shipping expense to the company. Doc. No. 28-1, Decl. of Law. On July 9, 2009 (the same day she placed Coppola on administrative leave with pay), Law shared the results of her investigative findings with Channel Services Manager Elizabeth Kelly, who recommended that both Coppola and Plaintiff be discharged for their misuse of PNC assets that resulted in personal gain and violated the Code of Ethics. *Id*. at ¶ 11.

## Standard of Review

**A.     Motion for Summary Judgment**

A court may grant summary judgment when "the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* at 248-49. "In considering the evidence, the court should draw all reasonable inferences against the moving party." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir.2007). However, while the moving party bears the initial burden of showing the absence of a genuine issue of material fact, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather its response must-by affidavits or as otherwise provided in [Rule 56]-set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).

**B.     Title VII**

Title VII protects employees from discrimination by their employers on the basis of race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2. Under Title VII, it is unlawful for an employer:

> To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000(e)(2). As the United States Supreme Court has explained:

> … In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green*.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 584-85 (2007).

Plaintiff does not claim that she has direct evidence of discrimination. In the absence of direct evidence of disparate treatment, cases such as Plaintiff's are examined under the

evidentiary framework first set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, a plaintiff must establish, by a preponderance of the evidence, a *prima facie* case of discrimination. *Id.* at 802. That is, a plaintiff must demonstrate 1) that she is a member of a protected class; 2) that she was qualified for the position in question; 3) that she was discharged; and 4) that she was terminated "'under circumstances that give rise to an inference of unlawful discrimination.'" *Waldron v. SL Indus. Inc.*, 56 F.3d 491, 494 (3d Cir.1995) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Establishing a *prima facie* case creates a presumption of unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Then, the burden of production shifts to defendant to set forth a legitimate, non-discriminatory reason for its action.[2] *Id.* Notably, the Third Circuit has held that this is a "relatively light burden" because the defendant "need not prove that the tendered reason actually motivated its behavior" but only that it may have. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).

Upon defendant advancing such a reason, the presumption of unlawful discrimination "'is rebutted' ... and 'drops from the case.'" *St. Mary's Honor Ctr.*, 509 U.S. at 507 (quoting *Burdine*, 450 U.S. at 255 & n. 10 (internal citation omitted)). Then, plaintiff must be given the opportunity to "show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes*, 32 F.3d at 763; *see also id.* at 764 (noting that a Title VII plaintiff may not "avoid summary judgment simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations"). To demonstrate pretext, plaintiff must provide evidence that

---

[2]     Although the *McDonnell Douglas* framework shifts the burden of production to defendant, the ultimate burden of persuasion always remains with plaintiff. *Burdine*, 450 U.S. at 253.

would allow a fact finder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action." *Id.* at 764. Summary judgment is appropriate on behalf of the employer if the employee fails to meet her burden at either the *prima facie* or pretext stage of the framework.

**Analysis**

Defendant seeks summary judgment on the grounds that Plaintiff has neither established a *prima facie* case of racial discrimination, nor that the reason given for her termination – a violation of the Code of Ethics – was pretext for racial discrimination. *See* Doc. No. 27.

**A.      Prima Facie Case**

It is undisputed that Plaintiff can establish the first and third elements of a *prima facie* case of unlawful discrimination based on her race. Plaintiff is a member of a protected class (African American) and her employment was terminated. With its motion for summary judgment, however, Defendant contends that Plaintiff has failed to establish the second and fourth prongs. *See* Doc. No. 27 at "Legal Argument" § II.A. More specifically, Defendant challenges the notion that Plaintiff was qualified for the position she held (thereby challenging the second element) and that she was terminated "'under circumstances that give rise to an inference of unlawful discrimination'" (regarding the fourth element). *Waldron*, 56 F.3d at 494 (quoting *Burdine*, 450 U.S. at 253). For the reasons that follow, the Court finds that Plaintiff has established a *prima facie* case of discrimination.

**1.      Qualified for the position prong**

PNC argues that Plaintiff cannot satisfy the second prong of her *prima facie* case because she has admitted that compliance with the Code of Ethics is a requirement to work at PNC and

that she violated the Code when she used Defendant's service arrangement with UPS for her own personal use. Plaintiff, in her deposition, admitted that she utilized Defendant's UPS machine to send a personal package to her brother living in Houston, TX, at the time. Doc. No. 28-1, Depo. Tr. of Plaintiff at Tr, pp. 22- 23. In so doing, Plaintiff did not personally pay for the cost of shipping the package, nor did she reimburse Defendant for the cost. *Id*. Plaintiff further acknowledged that the use of PNC property or services for personal use violates the Code of Ethics. Doc. No. 28-1, Depo. Tr. of Plaintiff at Tr. pp. 70 - 71. Plaintiff also admitted that adherence to PNC's Code of Ethics was a condition of her employment, and that her failure to abide by the Code of Ethics could lead to her discharge. *Id*. at 59 – 60, 70, 121, 125.

Defendant points to decisions by a sister court within the Third Circuit that have found that a plaintiff employee is not qualified for the position, and therefore cannot establish the second element of a *prima facie* case, in a situation in which the employee was terminated for cause. *See* Doc. No. 27 (citing *Fullman v. Potter*, 480 F.Supp.2d 782, 790 (E.D.Pa.2007) (Robreno, J.)(employee who was terminated for cause cannot show second prong of discrimination *prima facie* case) *aff'd* 254 Fed.Appx.919 (3d Cir. 2007); also citing *Robinson v. PFPC, Inc.* No 08-5113, 2010 WL 744191 (ED Pa. 2010)). Both *Fullman* and *Robinson* involved scenarios in which plaintiff-employee was fired for cause as the result of some kind of violation of their employers' workplace rules. Summary judgment was entered in both cases based upon determinations that the respective evidentiary records failed to establish the second *and* fourth prongs of the *prima facie* case, as well as, failures on the part of each plaintiff to successfully point to weaknesses, implausibilities, inconsistencies, or contradictions in the proffered legitimate non-discriminatory reason for the employers' actions.

In this case, there is no dispute that Plaintiff was employed for approximately eight years, nor is there any suggestion that she was not qualified to perform the tasks she was assigned to do. Likewise, there is no dispute with respect to the existence of the Code of Ethics, and that violations of the Code may result in termination. However, in view of the factual circumstances here, the Court measures whether Plaintiff has established the second element of the *prima facie* case by focusing on her individually, and whether she was qualified to hold her employment position. As noted, she was employed for years, and there was no evidence that she was unqualified for her position. Accordingly, she was qualified, *i.e.*, she held the requisite qualifications to perform the task for which she was hired to do, and therefore, the second prong is satisfied.[3] To hold otherwise would amount to collapsing Defendant's legitimate, non-discriminatory reason into Plaintiff's *prima facie* case, which defeats the burden shifting arrangement of *McDonnell Douglas*, and is something the Court is not inclined to do.

**2.       Inference of discrimination prong**

With no dispute as to the third prong regarding the fact that Plaintiff's employment was terminated, the Court turns to Defendant's challenge to the fourth prong of the *prima facie* case. The Third Circuit has adopted a flexible view of the requirements necessary with respect to the fourth element, rejecting the requirement that a plaintiff is required to prove that she was replaced by a person outside of the protected class to raise an inference of unlawful discrimination. *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 n. 7 (3d Cir.2003).

---

[3]       To be clear, the distinction between the second prong and the fourth prong turns upon the focus of the analysis. Where the second prong is focused on the plaintiff-employee, the fourth prong, as well as the legitimate, non-discriminatory reason, and the evidence of pretext, necessarily includes the actions of the employer-defendant. The second prong considers the fitness of the employee to hold the position, while the fourth prong considers the workplace performance of the employee, and whether any such action on the part of the employer in response to such performance gives rise to an inference of actionable discrimination. As always, the facts of the particular cases controls.

What is required, however, is the need for a plaintiff to demonstrate "some causal nexus between [her] membership in a protected class" and the adverse employment decision. *Id.*

Here, Defendant contends that Plaintiff cannot show that PNC failed to treat a similarly situated, non-African American employee differently, or to otherwise present evidence that would give rise to an inference of discrimination. Doc. No. 27. The Court disagrees. There is no dispute that Senior Employee Relations Investigator Law treated Plaintiff differently from Lynn Coppola, a similarly-situated employee not in Plaintiff's protected class, during the course of the investigation. It was Coppola, and not Defendant, who was the original focus of the investigation. When interviewed, Coppola apparently admits to using the machine and ostensibly sought to minimize her own inculpatory behavior by implicating Defendant. Despite committing the same violation of the Code of Ethics, however, Coppola was not placed on administrative leave at the conclusion of her interview, which was different from the action taken by Law to place Plaintiff on leave at the conclusion of Plaintiff's interview. Defendant references the fact that ultimately both employees were discharged for the proposition that there was no difference in treatment, contending that "PNC treated them exactly the same in addressing the misappropriation of assets." Doc. No. 27 at p. 10. Clearly, the resulting adverse action taken against both Defendant and Coppola was the same, namely that both had their employment terminated. However, the circumstances surrounding the process by which Defendant reached its decision raises an inference of discrimination sufficient to shift the burden to Defendant to articulate a legitimate, non-discriminatory reason for its action.

**B.    Pretext**

While the manner in which the allegations arose was a circumstance that could give rise to an inference of discrimination, the Court finds that Defendant's basis for terminating the

employment of Plaintiff, namely for her violation of the Code of Ethics, is sufficient evidence of a legitimate non-discriminatory reason for the adverse action. *See e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n. 2 (3d Cir.1997) (noting that the defendant's burden at this stage is relatively light and that it is satisfied if the defendant articulates a legitimate reason for the adverse employment action). This satisfies defendant's "relatively light" burden to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *See Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir.2006) (citing *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir.1994)).

Once an employer has stated a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff, in order to survive summary judgment, must meet the two-prong test articulated by the United States Court of Appeals for the Third Circuit in *Fuentes*:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* at 764.

A plaintiff must submit evidence that could cause a reasonable fact finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial. To discredit the employer's articulated reason, a plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, *Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir.1995), nor produce additional evidence beyond her *prima facie* case. *Fuentes*, 32 F.3d at 764. However, a plaintiff must demonstrate such:

> "weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence' " and hence infer that the proffered nondiscriminatory reason "did not actually

motivate" the employer's action. [*Fuentes*, 32 F.3d] at 764-65 (quoting [*Ezold*, 983 F.2d at 531]).

*Simpson*, 142 F.3d 639, 644.  The question asked in prong one of the *Fuentes* test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination.  *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir.1997).

If the stated rationale to justify an employment decision is so implausible that a fact finder could not believe it to be worthy of credence, a plaintiff has established pretext.  *See, e.g., Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir.1995)(holding that the employer's stated reason for plaintiff's termination, namely deficient sales performance, was contradictory to the evidence that plaintiff was the only sales employee to receive a bonus based upon performance three months prior to the termination).  According to the Court of Appeals in *Brewer*, "[a] fact finder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program-sales." *Id.*

Here, Plaintiff has made no such showing.  Plaintiff's own admission with respect to her use of the UPS machine precludes her from being able to establish that the proffered reasoning of Defendant has no basis in fact.  More specifically, the record is uncontroverted that Plaintiff conceded that she sent a personal package using Defendant's resources, and that she personally benefitted by not having to pay for the cost of the shipping herself.  Further, Defendant's Code of Ethics prohibits using company property for personal gain, a rule of which Plaintiff was aware. In the face of this evidentiary record, Plaintiff has failed to present sufficient evidence to allow a fact finder to conclude reasonably that "a discriminatory reason more likely motivated the employer" than the employer's proffered explanation that plaintiff was terminated because she

violated the Code of Ethics. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Plaintiff did not succeed in showing by evidence of record that the employer's proffered reason, that she violated company policy, "is unworthy of credence." *Id.* As such, Plaintiff cannot satisfy her burden of proving that defendant's reason was pretextual under the first prong of the *Fuentes* test.

The Court must next examine the second prong of the *Fuentes* framework to determine if Plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that could allow a fact finder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. *Simpson*, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated against her, (2) whether Defendant has discriminated against other people within her protected class or within another protected class, or (3) whether Defendant has treated more favorably similarly situated persons not within the protected class. *Id.* at 645. Plaintiff points to no evidence within the record of previous discrimination against her. Further, there is no evidence in the record of other people within the protected class, or in another protected class, being discriminated against. Instead, Plaintiff argues in her response in opposition that other employees witnessed her using the UPS machine on that particular occasion, that other employees committed the same violation of the Code of Ethics as she did without any sanctions from Defendant, and that the fact that she was placed on administrative leave, while Lynn Coppola was not, demonstrates that her race was a motivating or determinative factor. Doc. No. 31.

The Court will address Plaintiff's first two points in this regard together, specifically the allegations regarding the employees with whom she worked, other than Lynn Coppola. Plaintiff makes a number of assertions regarding the use of the UPS machine by other employees, none of whom received adverse action from Defendant. According to Plaintiff:

> All of my previous Caucasian co-workers (Sue Broman, Joe Frizzi, Mike Weber, and Mike Cendric) are still employed at PNC. They have all committed the same … offense as me (African American) but still they remain employed. … Jan Law stated that anyone found to have withheld information of anyone who had used the UPS machine for personal use or used it for their personal use would be as guilty and [such conduct would be] grounds for termination. They are still employed with PNC.

Doc. No. 31 at ¶ 9 & 10. While it is not clear whether Plaintiff is suggesting that her co-workers (Broman, Frizzi, Weber, and Cendric) were aware of her actions and failed to report it, or whether they, themselves, committed the same violation of the Code of Ethics, such a distinction is of no import here. What controls is what Defendant did, and further, what Defendant was able to discover through its investigation into the use of the UPS machine. The record is uncontroverted that upon the discovery that Lynn Coppola may have misused the UPS machine, an investigation was started and Coppola was interviewed. She admitted to the violation, and also implicated Plaintiff. Plaintiff was then interviewed, who also admitted to the violation. At some point, not clearly established within the record, Plaintiff made her claims about other employees using the UPS machine. An investigation was opened into those claims. A different investigator was assigned, and each employee was interviewed. Each employee, when interviewed, denied ever using the UPS machine for personal reasons, and further denied having witnessed Plaintiff use the machine for personal reasons. *See* Doc. No. 28, Appendix, at Exh. E (Decl. of Broman, Cindric, Frizzi, and Weber). In terms of other investigative means, PNC does not have the capability to utilize invoices for the purpose of tracking whether a particular package that was sent by an employee in Channel Services was done so for legitimate PNC

business or for personal reasons. Doc. No. 28, Appendix, at Exh. D, (Decl. of Judith Haas). As such, this subsequent investigation concluded that no other employee in Plaintiff's section violated the Code of Ethics by using the UPS machine to send personal packages. *Id*.

Taken together, aside from Plaintiff's unsupported allegation that other committed the same violations without any sanction, there is no evidence to support the notion that PNC treated similarly situated employees more favorably. She was suspected of committing an ethical infraction, and was investigated. Likewise, her co-workers were accused of committing an ethical infraction, and were also investigated. Plaintiff admitted to the misconduct, and received an adverse action as a result. Her co-workers were also interviewed and, with the exception of Coppola, denied any wrongdoing. There is no dispute that the manner in which PNC responded to the allegations, namely the initiation of an investigation, was the same for all. Different results of the respective investigations do not prove different treatment by the employer when the manner in which the investigations were conducted was uniform (which appears to be the case).

Plaintiff also contends that the fact that she was placed on administrative leave on June 29, 2009, after admitting to Jan Law that she used the UPS machine to send a personal package to her brother, while Lynn Coppola was permitted to remain at work is evidence of discriminatory animus of the part of Defendant. There is no dispute that the employment of Lynn Coppola was also terminated for the same violation of the Code of Ethics. In that sense, both Coppola and Plaintiff were treated the same. The distinction Plaintiff is attempting to draw is Defendant's placement on administrative leave while Coppola was not.

The Court considers the question of whether being placed on administrative leave with pay is an adverse action within the rubric of Title VII, and would therefore be considered a different form of treatment by Defendant as compared to Coppola. The Supreme Court has

defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Weston v. Pennsylvania*, 251 F.3d 420, 430–31 (3d Cir.2001)(Plaintiff failed to show how written reprimands effected a material change in the terms of conditions of employment); *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3d Cir.1999) (recognizing that although "direct economic harm is an important indicator of a tangible adverse employment action, it is not the sine qua non. If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found."). As the Supreme Court as noted, context matters, and the question of whether an action is materially adverse will often depend on "a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Burlington*, 548 U.S. at 69 (citations and internal quotation marks omitted). Examples of adverse employment actions "include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000)). While the United States Court of Appeals for the Third Circuit has not addressed whether the imposition of paid administrative leave is an adverse action, the Courts of Appeals for the Fourth, Fifth, Sixth, and Eighth Circuits have found that it is not. *See Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir.2005); *Peltier v. United States*, 388 F.3d 984, 988 (6th

Cir.2004); *Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir.2001); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir.2000).

In order to avoid over-reductionism, the Court will not make a bright line determination as to the question of whether paid administrative leave, in and of itself, is an adverse employment action.  Nevertheless, in considering the other surrounding circumstances in this evidentiary record, the Court finds that Plaintiff's placement on administrative leave with pay to be insufficient proof of more favorable treatment of Coppola as a basis to render Defendant's legitimate, non-discriminatory reason to be pretextual.  Neither Plaintiff nor Coppola lost any pay between the time of their interviews and subsequent employment terminations.  There is no suggestion or evidence of diminished capacity to earn income through commissions or other avenues that Plaintiff sustained while suspended.  Further, there was a key distinction between the violation of Coppola and the violation of Plaintiff.  Coppola's infraction occurred immediately preceding the investigation, and Investigator Law accepted Coppola's explanation that she intended to reimburse PNC once "the bill arrived."  Doc. No. 28, Appendix, at Exh. C at ¶ 6 (Decl. of Janice Law).   That explanation was acceptable to Law, at least for a relatively short period of time, and Coppola was permitted to remain at work.  *Id*   Once it became clear to Law that Coppola had no intention of reimbursing PNC, she placed Coppola on administrative leave with pay.  *Id*. at ¶ 10.  Plaintiff, on the other hand, violated the Code of Ethics more than eight months prior.  Law decided to place Plaintiff on administrative leave "based on Clark's complete misunderstanding of PNC's policies", particularly her inability to distinguish between acceptable use of electronic media, and improper use of corporate assets.  *Id*. at ¶ 9.

Plaintiff brings forward no evidence, much less a preponderance of evidence, to render Defendant's explanation implausible.  Instead, she simply points to the fact that she was placed

on administrative leave, while Lynn Coppola was not. Doc. No. 31. While such a difference in treatment was sufficient to give rise to an inference for the purpose of her prima facie case, that evidence alone, at least given this uncontroverted record, is insufficient to surmount Defendant's legitimate explanation for what it did.

In sum, Defendant has offered a legitimate, non-discriminatory reason for its decision to terminate the employment of Plaintiff, and Plaintiff has failed to carry either her burden of production or persuasion to render that explanation to be nothing more than pretext for racial discrimination.

## Conclusion

For the hereinabove stated reasons, the Motion for Summary Judgment filed by Defendant will be GRANTED.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA MARIE CLARK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2: 10-cv-00378** |
| | ) | |
| **PNC FINANCIAL SERVICES GROUP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER OF COURT**

**AND NOW**, this 14th day of November, 2011, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 26) is **GRANTED.**.

It is **FURTHER ORDERED** that Plaintiffs' Amended Complaint (Doc. No. 13) is

dismissed with prejudice.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:    Lisa Marie Clark
818 Gearing Avenue
Pittsburgh, PA 15210

Eric P. Reif, Esquire
Pamela G. Cochenour, Esquire
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
Email: epr@pietragallo.com
Email: pgc@pietragallo.com